PRECEDENTIAL

# UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

_____

No. 20-1778

_____

BALJINDER SINGH,

Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES OF
AMERICA,

Respondent

_____

On Petition for Review of an Order of the
United States Department of Justice
Board of Immigration Appeals
(BIA A072-435-798)
Immigration Judge:  Mirlande Tadal

_____

Argued
January 26, 2021

Before:  JORDAN, MATEY, *Circuit Judges*

and HORAN,[*] *District Judge*.

(Filed: August 31, 2021)

_____

Gintare Grigaite
363 Broadway
Bayonne, NJ  07002

John P. Leschak    [ARGUED]
Leschak & Associates
180 South Street
Freehold, NJ 07728
        *Counsel for Petitioner*

Virginia L. Gordon   [ARGUED]
Aaron D. Nelson
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC   20044
        *Counsel for Respondent*

_____

OPINION OF THE COURT

_____

_____

[*] The Honorable Marilyn Horan, United States District Judge for the Western District of Pennsylvania, sitting by designation.

JORDAN, *Circuit Judge*.

Baljinder Singh achieved what many immigrants to our country seek: he became a naturalized citizen. Unfortunately, he did so through willful misrepresentation, and, as a consequence, his citizenship was revoked. Before that revocation and while he was still a citizen, he was convicted of conspiracy to distribute and possess with intent to distribute illegal drugs. That led the government to initiate removal proceedings against him, and he was in fact ordered to be removed. Singh now petitions for review of that final order of removal, arguing that the pertinent statutory provisions, by their terms, permit removal only of individuals who were "aliens" at the time of their criminal convictions, whereas he was a naturalized citizen when convicted. The government responds that we must defer to the interpretation given by the Board of Immigration Appeals ("BIA") to those statutes and therefore must deny the petition for review. In the alternative, the government contends that Singh should be treated as if he had never been naturalized and was actually an "alien" at the time he was convicted. We disagree with both of the government's arguments and will grant Singh's petition for review.

## I.    BACKGROUND

Singh is a native of India who arrived in the United States in 1991. Upon arriving without travel documents or proof of identity, he falsely claimed that his name was Davinder Singh. The agency then responsible for administering our nation's immigration laws, the Immigration and Naturalization Service ("INS"), initiated exclusion

proceedings against him.  Singh failed to appear at his scheduled immigration hearing in January 1992, and an Immigration Judge ("IJ") ordered him deported *in absentia*.

Despite that deportation order, in February 1992, Singh filed an asylum application under the name Baljinder Singh. While the application was pending, he married a U.S. citizen. Singh also petitioned to adjust his status from alien to lawful permanent resident but did not disclose his prior immigration history and deportation order in his application.  In 1998, the INS approved his petition, and he received lawful permanent resident status.

When Singh later sought naturalization, he again failed to disclose his prior immigration history, despite being directly asked whether he had ever used other names or lied to gain entry to the United States.  He falsely answered those questions in the negative, and did so under penalty of perjury.  Singh's citizenship application was approved, and on July 28, 2006, he became a citizen of the United States.

Soon, however, he was in serious trouble with the law. In 2011, he pled guilty to conspiracy to distribute and possess with intent to distribute heroin, MDMA,[1] and marijuana, in violation of 21 U.S.C. §§ 846, 841(a)(l), 841(b)(l)(A)(I), and

---

[1]     MDMA, short for 3,4-methylenedioxymethamphetamine, is also sometimes called "ecstasy" and is a psychoactive drug listed as a schedule I controlled substance.  *Drug Scheduling*, U.S. DRUG ENFORCEMENT ADMIN., https://www.dea.gov/drug-scheduling (last visited March 29, 2021).

841(b)(l)(C). His drug dealing lasted from at least September 2007 to November 2008.

Several years later, the government filed a complaint to revoke Singh's citizenship in the United States District Court for the District of New Jersey, invoking 8 U.S.C. § 1451(a) and stating two independent reasons why his citizenship should be revoked: first, he illegally procured naturalization because he was never lawfully admitted for permanent residence, and second, he procured naturalization by concealment of a material fact or willful misrepresentation. The government subsequently filed a motion for summary judgment. The court granted that motion on January 5, 2018, and revoked Singh's citizenship, "order[ing] that the Certificate of Naturalization ... issued to Defendant on July 28, 2006 is hereby cancelled." (A.R. at 276.)

The Department of Homeland Security ("DHS") served Singh with a notice to appear in immigration court, charging him with removability under 8 U.S.C § 1227(a)(2)(A)(iii) (the "aggravated felony provision" of the Immigration and Nationality Act ("INA")) for having been convicted of an offense relating to illicit trafficking in controlled substances, and under 8 U.S.C § 1227(a)(2)(B)(i) (the "controlled substances provision" of the INA) for having been convicted of a controlled substances crime. DHS later filed an additional charge of removability, saying Singh was removable under the aggravated felony provision for having been convicted of a felony relating to conspiracy to illicitly traffic controlled substances.

Singh responded with a motion to terminate the removal proceedings. He argued that he could not be removed under

the aggravated felony provision because he was a naturalized citizen at the time of his conviction, and he said his subsequent loss of citizenship could not retroactively make him an "alien." DHS successfully opposed the motion before the IJ, and Singh filed a motion to reconsider, which the IJ denied.

The IJ held Singh removable both for having been convicted of an aggravated felony as described in 8 U.S.C. § 1101(a)(43)(U), namely conspiracy to commit a controlled substances offense, and for having been convicted of a controlled substances offense. Singh was therefore ordered to be removed to India.

He appealed, but the BIA accepted the IJ's conclusions and dismissed the appeal. This petition followed.

## II.    DISCUSSION[2]

Singh argues that he cannot be removable under the aggravated felony or controlled substances provisions of the INA because he was a naturalized citizen at the time he was

---

[2]    The BIA had jurisdiction under 8 C.F.R. § 1003.1(b)(3), and we have jurisdiction under 8 U.S.C. § 1252(a), though our jurisdiction to review a final order of removal based on the commission of an aggravated felony or a controlled substances offense is limited to "constitutional claims or questions of law[.]" 8 U.S.C. § 1252(a)(2)(C)-(D). We review the BIA's legal determinations *de novo*, unless *Chevron* deference applies. *Sambare v. Att'y Gen.*, 925 F.3d 124, 127 (3d Cir. 2019).

convicted.[3] He contends that the only relevant time is the time of conviction, and because he was not an "alien" at that time, he is not removable under either provision. *See* 8 U.S.C.

---

[3] The aggravated felony provision, 8 U.S.C. § 1227(a)(2)(A)(iii), provides:

> (a) Classes of deportable aliens - Any alien (including an alien crewman) in and admitted to the United States shall, upon the order of the Attorney General, be removed if the alien is within one or more of the following classes of deportable aliens: ... (2) Criminal offenses (A) General crimes ... (iii) Aggravated felony - Any alien who is convicted of an aggravated felony at any time after admission is deportable.

The controlled substances provision, 8 U.S.C § 1227(a)(2)(B)(i), provides:

> (B) Controlled substances – (i) Conviction - Any alien who at any time after admission has been convicted of a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 802 of Title 21), other than a single offense involving possession for one's own use of 30 grams or less of marijuana, is deportable.

§ 1101(a)(3) ("The term 'alien' means any person not a citizen or national of the United States."). Central to Singh's argument is the Supreme Court decision in *Costello v. INS*, 376 U.S. 120 (1964), which held that a similarly-phrased deportation provision did not apply to a person who was a naturalized citizen at the time he was convicted but who was later denaturalized for fraud, like Singh. *Costello*, 376 U.S. at 121-22.

Singh argues that the BIA erred by declining to follow *Costello* and by instead relying on *Matter of Rossi*, 11 I. & N. Dec. 514 (BIA 1966), and *Matter of Gonzalez-Muro*, 24 I. & N. Dec. 472 (BIA 2008), two decisions in which the BIA distinguished *Costello* even though the respondents were naturalized citizens at the time they were convicted of deportable offenses, just as Costello was. In addition, Singh argues that the BIA erred by saying his circumstances were indistinguishable from those of the respondent in *Gonzalez-Muro*, who was a lawful permanent resident during the commission of the crimes but a naturalized citizen at the time of conviction. Finally, Singh contends that *Rossi* and *Gonzalez-Muro* conflict with *Padilla v. Kentucky*, 559 U.S. 356 (2010), which held that failure to advise a non-citizen criminal defendant that pleading guilty may result in deportation constitutes ineffective assistance of counsel and violates the Sixth Amendment right to counsel.

The government responds that we must defer to the BIA's ruling in this case because it was directly controlled by precedential BIA decisions. Waiving any argument based on

the controlled substances provision of the INA,[4] the government focuses on the aggravated felony provision and says the familiar *Chevron* rule of deference applies.[5] The government reasons that the aggravated felony provision is ambiguous and the BIA's interpretation of the provision is reasonable, and hence that interpretation is controlling. The government also points to the *Rossi* decision's reliance on *United States ex rel. Eichenlaub v. Shaughnessy*, 338 U.S. 521 (1950), which it argues is more analogous to Singh's circumstances than is *Costello*.

Our analysis of the parties' conflicting positions proceeds in three steps. We first review *Costello* and *Eichenlaub*, the two Supreme Court decisions interpreting whether deportation statutes cover individuals who were

---

[4] The government waived any argument as to the controlled substances provision by failing to brief it. *Khan v. Att'y Gen.*, 691 F.3d 488, 495 n.4 (3d Cir. 2012) ("[A]n issue is waived unless a party raises it in its opening brief, and for those purposes a passing reference to an issue will not suffice to bring that issue before this court." (quoting *Skretvedt v. E.I. DuPont DeNemours*, 372 F.3d 193, 202-03 (3d Cir. 2004))).

[5] As discussed in greater detail herein, *infra* section II.B., *Chevron* deference involves a two-step inquiry. At step one, we ask whether the statute at issue "is silent or ambiguous with respect to the specific issue[.]" *Yusupov v. Att'y Gen.*, 518 F.3d 185, 198 (3d Cir. 2008) (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 843 (1984)). If the statute is ambiguous, we ask, at step two, whether the BIA's interpretation is reasonable. *Id.*

citizens at the time of conviction but were subsequently denaturalized. Next, we discuss whether *Chevron* deference applies. Then, having determined that it does not, we consider whether the text of the aggravated felony provision, as understood in light of Supreme Court precedent, provides for the removal of individuals who were citizens at the time of conviction.

## A.    Applicable Supreme Court precedent.

The Supreme Court has twice considered whether deportation provisions using the term "aliens" apply to individuals who were naturalized citizens at the time they were convicted of crimes but subsequently were denaturalized for having acquired their citizenship through fraud or willful misrepresentation. *See Costello*, 376 U.S. at 128; *Eichenlaub*, 338 U.S. at 532. Singh argues that the petitioner in *Costello* was held to be not deportable because he was a citizen when convicted, which is precisely his own circumstance. The government contends that *Costello* does not apply because it was predicated on a specific legal remedy – a judicial recommendation against deportation – that has since been abrogated and was never available to Singh. Instead, says the government, Singh's case is akin to *Eichenlaub*, a case in which one-time citizens were deemed deportable.

*Eichenlaub* is the earlier opinion. In that case, the individuals seeking relief were naturalized citizens convicted of conspiracy to violate the Espionage Act of 1917. *Eichenlaub*, 338 U.S. at 523. They were subsequently denaturalized for procuring their citizenship by fraud. *Id*. The Supreme Court held them deportable under a statute directed at "all aliens who since August 1, 1914, have been or may

hereafter be convicted" of violations of the Espionage Act. *Id.* at 523-27 (quoting Act of 1920, Pub. L. No. 197, 41 Stat. 593). The Court said that the plain language of the statute did not "limit its scope to aliens who have never been naturalized[,]" *id.* at 528, and that Congress's decision to not make a distinction between aliens who had never been naturalized and those who were naturalized but later denaturalized indicated the statute "is applicable to all such offenders." *Id.* at 530. It decided that there were national security implications to the case that had to be considered and it also noted that a contrary holding would allow a denaturalized alien "to set up a canceled fraudulent status as a defense, and successfully ... claim benefits and advantages under it." *Id.* at 531-32. While ruling largely for the government, the Court nevertheless rejected the government's urging to "give a retroactive effect to the denaturalization orders[.]" *Id.* at 529-30. It based its holding instead on the interpretation of the plain text of the statute. *Id.*

In *Costello*, the Supreme Court addressed a since-revised deportation provision which, though focused on crimes of moral turpitude, bears important textual similarities to the aggravated felony provision before us now. The Court considered whether that former section of the INA, 8 U.S.C. § 1251(a)(4), now amended and located at 8 U.S.C. § 1227(a)(2)(A)(ii), applied to someone who was a naturalized citizen when he was convicted of income tax evasion but who was later denaturalized on the ground that his citizenship had been acquired by willful misrepresentation. *Costello*, 376 U.S. at 121. Similar to the aggravated felony provision, the "moral-turpitude" deportation provision provided that "[a]ny alien in the United States ... shall ... be deported who ... at any time after entry is convicted of two crimes involving moral turpitude[.]" *Id.* (quoting 8 U.S.C. § 1251(a)(4)).

The *Costello* Court considered the provision's statutory language, the relevance of *Eichenlaub*, legislative history, the statutory scheme, and the rule of lenity. *Id.* at 122-28. It held that the statute's present tense verbiage—"*is* convicted"—and the phrase "at any time after entry" did not resolve whether the petitioner was subject to removal under the statute at issue. *Id.* at 122, 125 (emphasis added). The Court distinguished *Eichenlaub*, finding it "evident" from the past tense verb in the statute at issue there and clear legislative history evincing intent to deport "denaturalized citizens along with aliens ... for specific crimes involving national security[,]" that deportation was in order in that case. *Id.* at 123-24. None of those considerations, however, were implicated by the statute the *Costello* Court faced. *Id.* at 124.

Because the language and history of the statute did not resolve the ambiguity the *Costello* Court perceived in it,[6] the Court turned to a specific legal remedy available to the

---

[6] The Court specifically referenced the "ambiguity of the statutory language" as one conveying two "possible readings of the statute[.]" *Costello v. INS*, 376 U.S. 120, 124-25 (1964). It "t[ook] a different view" from the court of appeals, which found "no ambiguity ... and no room for interpretation or construction." *Id.* at 122-23 (citation and quotation mark omitted). And it painstakingly distinguished the moral-turpitude deportation provision from the statute at issue in *Eichenlaub*, which, in contrast, was viewed by the Court "as una[m]biguously authorizing deportation." *Id.* at 123. All of this was, of course, two decades before *Chevron* changed the legal consequences of declaring a statute to be ambiguous.

petitioner to reach its holding. That legal remedy, the judicial recommendation against deportation ("JRAD"), allowed a sentencing court to recommend that an alien should not be deported even if statutorily eligible for that consequence. *Id.* at 126. The Court reasoned that, if the deportation provisions of the statute at issue "were construed to apply to those convicted when they were naturalized citizens, the protective provisions of [the JRAD] would, as to them, become a dead letter" because sentencing courts lacked jurisdiction to make a JRAD recommendation on behalf of a citizen. *Id.* at 127. The Court said it would "hesitate" before adopting the government's construction of the statute as that interpretation would "completely nullify a procedure so intrinsic a part of the legislative scheme" for "an entire class of aliens." *Id.* at 127-28.

Then, looking at the rule of lenity,[7] the Court continued: "If, however, *despite* the impact of [the JRAD provision], it should still be thought that ... the matter [was] in some doubt, we would nonetheless be constrained by accepted principles of statutory construction in this area of the law to resolve the doubt in favor of the petitioner." *Id.* at 128 (emphasis added). The magnitude of the penalty of deportation warranted application of the rule of lenity, thus giving the benefit of ambiguity to the petitioner, not the government. The Court declared, "we will not assume that Congress meant to trench on [the petitioner's] freedom beyond that which is required by

---

[7] The rule of lenity in the immigration context is "the longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the alien." *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987) (citations omitted).

the narrowest of several possible meanings of the words used." *Id.* (quoting *Fong Haw Tan v. Phelan*, 333 U.S. 6, 10 (1948)).

The *Costello* Court also rejected the government's alternative argument, under which the petitioner's citizenship would be considered a nullity from the start because 8 U.S.C. § 1451(a) provides that an order of denaturalization "shall be effective as of the original date" of the naturalization order. *Id.* at 128-29 (citing 8 U.S.C. § 1451(a)). The government contended that the cancellation of the petitioner's certificate of naturalization related back to the year of his original naturalization, thus making him an alien at the time he was convicted. *Id.* at 129. The Court called the "relation-back concept ... a legal fiction at best," and found no indication in the text or history of § 1451(a) that Congress intended it to apply to "the general deportation provisions of the [INA]." *Id.* at 129-30. Instead, the Court explained that Congress codified existing case law that denaturalization related back to the date of naturalization "for the purpose of determining rights of derivative citizenship," not for "construing a deportation statute." *Id.* The relation-back "fiction" had been effectively rejected in *Eichenlaub*, and the Court adhered to that. *Id.* at 130.

**B.    We need not defer to the BIA's decision under *Chevron*.**

We next consider whether we must defer to the BIA's ruling in Singh's case. Although we do not afford *Chevron* deference to nonprecedential BIA decisions, *see Da Silva v. Att'y Gen.*, 948 F.3d 629, 633 (3d Cir. 2020), the government argues that the BIA's decision interpreting the aggravated felony provision in Singh's case is entitled to deference

because it is directly controlled by the BIA's precedential decisions in *Rossi* and *Gonzalez-Muro*. We agree at least that the *Chevron* framework is applicable to determine whether deference is warranted.[8] *See Mejia-Castanon v. Att'y Gen.*, 931 F.3d 224, 231, 236 (3d Cir. 2019) (deferring to a nonprecedential BIA decision that relied on a precedential BIA decision). But Singh prevails within the context of the two-step *Chevron* inquiry.

---

[8] There are certain situations in which *Chevron* deference is not applicable as a threshold matter, but Singh's arguments do not persuade us that this is one. He first argues that we should not defer to the agency because *Costello* controls our analysis. But the Supreme Court declared that "a court's prior interpretation of a statute ... override[s] an agency's interpretation only if the relevant court decision held the statute unambiguous." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 984 (2005). Because that question turns on whether the prior case viewed the statute as delegating gap-filling power to the agency through ambiguous language, it is better suited for discussion at the first step of *Chevron*. *See United States v. Home Concrete & Supply, LLC*, 566 U.S. 478, 488-89 (2012).

Nor are we persuaded by Singh's remaining arguments that the government waived the application of *Chevron* for failure to raise it previously or that this case implicates such an "extraordinary" issue that Congress would not have delegated it to an agency. *Cf. King v. Burwell*, 576 U.S. 473, 485-86 (2015) (declining to defer where the interpretation of Affordable Care Act's tax credit provision "involv[ed] billions of dollars in spending each year and affect[ed] the price of health insurance for millions of people").

1.    *Chevron* Step One

The first step of the *Chevron* inquiry requires us to ask whether the statute is ambiguous as to Singh's removability. *Yusupov v. Att'y Gen.*, 518 F.3d 185, 197 (3d Cir. 2008).  If Congress did not leave the statute ambiguous as to the specific issue under consideration, we do not defer to the agency's interpretation. *Id.*  "In discerning congressional intent, we look first to the plain text of the statute." *Cazun v. Att'y Gen.*, 856 F.3d 249, 255 (3d Cir. 2017).

The aggravated felony provision provides:

(a) Classes of deportable aliens - Any alien (including an alien crewman) in and admitted to the United States shall, upon the order of the Attorney General, be removed if the alien is within one or more of the following classes of deportable aliens: ... (2) Criminal offenses (A) General crimes ... (iii) Aggravated felony - Any alien who is convicted of an aggravated felony at any time after admission is deportable.

8 U.S.C. § 1227(a)(2)(A)(iii).  The INA defines the term "alien" to mean "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3).  As someone who was a naturalized citizen at the time of his conviction, Singh argues that the aggravated felony provision unambiguously excludes him, as Congress limited the reach of that provision to those who were aliens at the time of conviction.  The government contends that, to the contrary, the aggravated felony provision is ambiguous because it allows for two plausible interpretations: one applying to any person who was an alien

at the time of conviction for the removable offense, and the other applying to any person who is now an alien, regardless of his or her citizenship status at the time of conviction for the offense.

The government's position requires some suspension of disbelief. After all, the statute is expressly directed at "aliens," and one who is a citizen is, by definition, not an alien. It would seem there is no ambiguity there. The natural reading of the passive voice, present tense verb ("[a]ny alien who is convicted") indicates it is important that citizenship status be assessed as of the time of conviction. 8 U.S.C. § 1227(a)(2)(A)(iii). The Supreme Court's distinguishing of the *Eichenlaub* statute's past tense verb buttresses that interpretation, since aliens who "have been" convicted need not have been aliens at the time of conviction to fit within that linguistic scope. *Costello*, 376 U.S. at 123. And for the reasons explained in *Costello*, the phrase "at any time after admission" would not violate the presumption against superfluity if the statute required the individual facing removal to have been an alien at the time of conviction, as it could be read to permit the removal of aliens who were not originally excludable but were convicted after admission. *Id.* at 125; 8 U.S.C. § 1227(a)(2)(A)(iii).

In addition, "'our duty to construe statutes, not isolated provisions,' means that definitions in other parts of the INA may also shed light on what Congress envisioned[.]" *Si Min Cen v. Att'y Gen.*, 825 F.3d 177, 193 (3d Cir. 2016) (quoting *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 568 (1995)). We "'normally' give 'identical words and phrases within the same statute … the same meaning,'" *id.* (quoting *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007)

(alteration in original)), and the corollary of that canon is equally true: parallel provisions in the same statute utilizing different words suggest differing meanings. *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (alteration in original) (citations omitted)). Thus, when we see, in contrast to the phrase "is convicted" in the aggravated felony provision, 8 U.S.C. § 1227(a)(2)(A)(iii), the use of the past tense "has been convicted" elsewhere in the INA, it lends further support to the conclusion that the aggravated felony provision excludes Singh. For example, the controlled substances provision permits deportation of any alien who "*has been convicted*[.]" 8 U.S.C § 1227(a)(2)(B)(i) (emphasis added). Congress's choice of a different verb tense in a parallel deportation provision of the INA demonstrates that the aggravated felony provision only applies to individuals who were aliens at the time of conviction.

All of that would lead us to agree with Singh that, as a textual matter, the aggravated felony provision unambiguously excludes him from its reach. But our analysis does not end there. The government is quick to point out that the Supreme Court in *Costello* held the text of the similarly worded moral-turpitude provision was ambiguous. And the government contends that we should accept that finding of ambiguity, but not *Costello*'s holding against deportability, as "[a] court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute[.]" *Nat'l Cable &*

*Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005). That is the sum total of the government's reasoning on this point. It offers no independent textual analysis of the aggravated felony provision but simply relies on *Costello*'s reference to ambiguity in the moral-turpitude provision. It likes that much of *Costello*, but only that much. And it is true that the two removal provisions have similar wording and identical purposes—describing what types of crimes render aliens removable if the aliens are convicted.

We thus find ourselves in the difficult position of looking at statutory text that seems plain to us but is very similar to language declared by the Supreme Court to be ambiguous, although that declaration came long before *Chevron* imbued the notion of ambiguity with the transformative power it now has. To utter the word "ambiguous" today is to shift authority for statutory interpretation from the judicial to the executive branch, which makes for quite a large footnote to *Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.").

In *Hylton v. Attorney General*, the United States Court of Appeals for the Eleventh Circuit recently faced the conundrum created by *Costello*'s invocation of ambiguity, and found its way out by saying, "a pre-*Chevron* recognition of linguistic ambiguity does not necessarily establish ambiguity in the *Chevron* sense." 992 F.3d 1154, 1160 (11th Cir. 2021). For that principle, the court relied on a plurality opinion of the Supreme Court in *United States v. Home Concrete & Supply, LLC*, 566 U.S. 478, 488-89 (2012). The Supreme Court said there that *stare decisis* may, in certain circumstances, triumph over *Chevron* deference, and it declined to afford deference to

an agency's statutory construction despite statutory ambiguity.[9] *Id.* at 488-90. The Eleventh Circuit took that same route in holding that a petitioner in exactly Singh's position was not removable under the aggravated felony provision because he was a citizen at the time of conviction. *Hylton*, 992 F.3d at 1160-61. It reasoned that the "plain meaning" of the aggravated felony provision "forecloses the [BIA's] interpretation, and binding precedent, [*Costello*], forecloses treating Hylton's denaturalization as retroactive for removal

---

[9] The *Home Concrete* plurality held that a prior pre-*Chevron* case, *Colony, Inc. v. Comm'r*, 357 U.S. 28, 33 (1958), did not "reflect[ ] a post-*Chevron* conclusion that Congress had delegated gap-filling power to the agency." 566 U.S. at 488-89. The plurality acknowledged that the *Colony* Court stated the statutory language at issue was "not 'unambiguous[,]'" and then posited that "[t]he question is whether the Court in *Colony* concluded that the statute left such a gap." *Id.* at 488-89 (quoting *Colony*, 357 U.S. at 33). It looked to several factors to decide that there was no gap for the agency to fill: *Colony* "said that the taxpayer had the better side of the textual argument[,]" it viewed the legislative history as demonstrating "that Congress had decided the question definitively," and a contrary interpretation "would create a patent incongruity in the tax law." *Id.* at 489 (citations and internal quotation marks removed).

In an opinion concurring except as to the plurality's discussion relevant to this issue, Justice Scalia viewed *Colony* in a different light, saying that it made "it *inescapably clear* that the Court thought the statute ambiguous[.]" *Id.* at 494 (Scalia, J., concurring in part and concurring in the judgment).

purposes." *Id.* at 1156. It thus granted the petition for review. *Id.* at 1161.

We agree with most of that reasoning but have difficulty with one key aspect of the decision. We have trouble getting past *Costello*'s emphasis on the ambiguity of the nearly identical statutory language. *See Costello*, 376 U.S. at 124 (explaining that the parties' differing interpretations "are both possible readings of the statute"); *see also Home Concrete*, 566 U.S. at 496 (Scalia, J., concurring in part and concurring in the judgment) (warning that, where the prior case interpreting the statute "said unambiguously that the text was ambiguous," a later court's contrary conclusion would "deny *stare decisis* effect to [the prior case] as a pre-*Chevron* decision"); *Marks v. United States*, 430 U.S. 188, 193 (1977) (explaining that a plurality holding "may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds[.]" (citation and internal quotation marks omitted)).

The *Hylton* court held that the moral turpitude provision at issue in *Costello* "was ambiguous only when read in isolation; the ambiguity no longer remained when the language was read in its statutory context, as it must be." 992 F.3d at 1160. And, the court continued, reading the language in context required resort not only to the JRAD provision, which is no longer available, but also to the immigration rule of lenity. *Id.* That led the court to conclude that, "[w]hen a court interprets a statute before the agency does and determines that the statute is unambiguous based on the rule of lenity, its reading is binding on the implementing agency." *Id.* at 1160-61 (citing *Brand X*, 545 U.S. at 984-85).

Rather than follow that line of reasoning, however, we can assume without deciding that there is ambiguity at *Chevron* step one, because, at step two, the agency's construction is unreasonable and therefore not entitled to deference.[10]

---

[10] We are not persuaded that *Brand X* provides the support that the Eleventh Circuit attributes to it for the proposition that a court's statutory interpretation pinned to the rule of lenity is free of the strictures imposed by *Chevron*. The Supreme Court in *Brand X* was emphatically reenforcing the power of *Chevron*, and in doing so faulted a conclusion of the Ninth Circuit indicating that a prior judicial construction of a statute was binding on the agency charged with administering the statute. *See Brand X*, 545 U.S. at 985 ("Before a judicial construction of a statute, whether contained in a precedent or not, may trump an agency's, the court must hold that the statute unambiguously requires the court's construction.") The *Brand X* Court referenced the rule of lenity only in passing, and then did so in a way that, while not entirely clear, we take as indicating that a court's refusal to apply the rule of lenity presupposes an unambiguous statute. *Id.* at 984. Indeed, *Brand X* cites *Chapman v. United States*, 500 U.S. 453 (1991), which emphasizes that the rule of lenity "is not applicable unless there is a 'grievous ambiguity or uncertainty in the language and structure of the Act[.]'" *Id*. at 463 (citation omitted). Whether the rule of lenity or *Chevron* deference applies first to resolve ambiguity is an arguable issue, but we decline to address it in dicta here. *See Esquivel-Quintana v. Sessions,* 137 S. Ct. 1562, 1572 (2017) (declining to "resolve whether the rule of lenity or *Chevron* receives priority"); *Cazun v. Att'y Gen.*, 856 F.3d 249, 256 n.14 (3d Cir. 2017) ("[W]e have never found that [the rule of lenity] clarifies an ambiguous statute ... such that it does away with the need to

2.    *Chevron* Step Two

At step two, we determine whether the BIA's conclusion "is based on a permissible construction of the statute." *Yusupov*, 518 F.3d at 198 (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 843 (1984)). A permissible construction is one that is reasonable. *Id.* We do not ask whether the BIA's statutory interpretation is the best possible, but instead "inquire only whether [the agency] made 'a reasonable policy choice' in reaching its interpretation." *Mejia-Castanon*, 931 F.3d at 235-36 (citations omitted). Importantly, deference is not owed to an agency decision that lacks reasoning. *See Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.*, 730 F.3d 291, 314 (3d Cir. 2013) (holding agency action was arbitrary and capricious "because we cannot discern from the record a reasoned basis for the agency's decision"); *Robles-Urrea v. Holder*, 678 F.3d 702, 709-10 (9th Cir. 2012) (declining to defer to the BIA at *Chevron* step two because it "entirely fails to explain why" its interpretation is reasonable); *TNA Merch. Projects, Inc. v. F.E.R.C.*, 616 F.3d 588, 593 (D.C. Cir. 2010) ("[A]lthough we will defer to a reasonable definition by the [Federal Energy Regulatory] Commission, we cannot defer to one that is unexplained.").

Recall that, in Singh's case, the BIA did not explain its interpretation of the removal provision.  It was content to cite its earlier decisions in *Matter of Rossi*, 11 I. & N. Dec. 514 (BIA 1966), and *Matter of Gonzalez-Muro*, 24 I. & N. Dec.

---

proceed to *Chevron*'s second step").  Hence our decision to assume without deciding that there is ambiguity in the aggravated felony provision.

472 (BIA 2008), and to assert that "[t]he Supreme Court's concerns in *Costello* centered around the alien's ability to seek" JRAD relief.  (A.R. at 4.)  But *Rossi* and *Gonzalez-Muro* do not adequately explain why *Costello* was not controlling in those cases – or why *Eichenlaub* was.  They assert, without discussion, that *Costello* was primarily concerned with the now-defunct JRAD provision, and they ignore entirely the careful textual analysis the Supreme Court engaged in while distinguishing *Eichenlaub*.  *See Rossi*, 11 I. & N. Dec. 514, 515-16 (BIA 1966) ("[W]e are satisfied that [*Costello*] was, in fact, primarily predicated on the provisions of section 241(b) and the fact that Costello, being a naturalized citizen at the time of his convictions, was deprived of any opportunity of requesting the sentencing court to recommend against his deportation."); *Gonzalez-Muro*, 24 I. & N. Dec. 472, 473 (BIA 2008) (citing *Rossi*'s statement that *Costello* was "primarily predicated" on the availability of the JRAD provision and "find[ing] the same to be true in this case, … [so] that *Costello* is also not controlling here").[11]

The government reprises that approach in this case.  It argues that the BIA's interpretation of the aggravated felony provision was reasonable because *Costello*'s holding relied on the availability of JRAD relief, which was repealed in 1990 and therefore unavailable to Singh.  The problem with both the

---

[11] The BIA also noted in *Gonzalez-Muro* that the deportee had committed crimes when he was a lawful permanent resident, though he became a naturalized citizen before he was convicted, and that was another basis on which to distinguish *Costello*.  24 I. & N. Dec. 472, 473-74 (BIA 2008).  But that is irrelevant in Singh's case, as he was a naturalized citizen at the time of his crimes.

BIA's analysis and the government's argument is that *Rossi* didn't give *any* reason for its holding except a bare assertion. *See* 11 I. & N. Dec. 514, 515-16 (BIA 1966) (saying, "[a]fter careful analysis, … we are satisfied" etc.).   Without independent analysis of the removal provision at issue there, *Rossi* simply stated in a conclusory fashion that the JRAD provision was the centerpiece of *Costello* and that the case then before it could "[]not be distinguished from" *Eichenlaub* so removal was proper. *Id.*

The BIA is free at any time to try to distinguish *Costello*. What it is not free to do is to declare without analysis what *Costello* was "primarily predicated on" and then to embrace *Eichenlaub* without any reasoning. *Rossi*, 11 I. & N. Dec. at 515. In *Rossi*, the BIA should have engaged in its own interpretation of the pertinent deportation provision, just as in Singh's appeal it should have engaged in its own interpretation of the aggravated felony provision. Moreover, in *Rossi*, in *Gonzalez-Muro*, and now in this case, it has consistently failed to recognize that *Costello* distinguished *Eichenlaub*'s holding in material ways, such as the espionage deportability provision's use of a past tense verb and a specific time limitation, and specific legislative history providing more guidance for the Court than the "generalized" legislative purpose of broadening deportation of criminal aliens.[12]

---

[12] The government attempts to liken the *Eichenlaub* statute's legislative purpose to that of the aggravated felony provision by citing the Illegal Immigration Reform and Immigrant Responsibility Act (the "Act"), which amended the aggravated felony definition in order to "increase the severity of the consequences for aliens convicted of crimes." (Answering Br. at 35 (quoting *Matter of Rodriguez-Rodriguez*,

*Costello*, 376 U.S. at 124, 126.  As for the aggravated felony provision at issue here, it does not use the phrase "all aliens who … have been … convicted" and does not provide a specific time limitation for convictions like the espionage provision in *Eichenlaub*, nor does its legislative history implicate far-reaching national security concerns.  *See id.* at 123-25.  The BIA's implicit conclusion that the aggravated felony provision could not be distinguished from the statute at issue in *Eichenlaub* is, like its explicit rejection of *Costello*, an *ipse dixit*, not a reasoned decision.

---

22 I. & N. Dec. 991, 994 (BIA 1999)).)  That purpose is nearly identical to the purpose that the *Costello* Court found "generalized" and unhelpful.  *Costello*, 376 U.S. at 125-26.

   The government also argues that the Act's amendment to the aggravated felony definition in 8 U.S.C. § 1101(a)(43), which "shall apply to actions taken on or after the date of the enactment of this Act, regardless of when the conviction occurred[,]" somehow indicates that Congress intended the aggravated felony provision of 8 U.S.C § 1227(a)(2)(A)(iii) to include citizens at the time of conviction.  (Answering Br. at 35-36 (quoting Pub. L. No. 104-208, 110 Stat. 3009-546).)  That argument fails because, had Congress sought to include within the aggravated felony provision aliens who were naturalized citizens at the time of conviction, it would have amended the "any alien who is convicted" language in that provision.  But the Act did not amend the aggravated felony provision or the definition of "alien" in 8 U.S.C. § 1101(a)(3).  *See Hylton*, 992 F.3d at 1161; *Okpala v. Whitaker*, 908 F.3d 965, 970 n.3 (5th Cir. 2018).

Without an independent analysis of the statutory text, and with strong text-based arguments to the contrary, the BIA's decision in Singh's case appears to be nothing more than an unreasoned declaration of law based on earlier unreasoned declarations.  It is thus rightly seen as arbitrary.[13]  *See Christ the King Manor, Inc.*, 730 F.3d at 314 (holding that the agency's action was arbitrary and capricious because it did not supply a "reasoned basis" for its decision).  Accordingly, we decline to defer to the BIA's interpretation of the aggravated felony provision.

## C.    Singh is not removable under the aggravated felony provision.

Unconstrained by *Chevron* deference, we hold that, since Singh was a naturalized citizen at the time of his conviction, he is not removable under the aggravated felony provision.[14]  As noted earlier, the language of that provision is

---

[13] Citing *Eichenlaub*, the government attempts to impute policy considerations to the BIA's decisions by explaining that Congress would not have intended "to permit the removal of aliens who never naturalized, but prohibit the removal of aliens who naturalized before their convictions[.]" (Answering Br. at 38.)  That rationale, however, was undermined in *Costello*, in which the Court said that "it is not at all certain" that the petitioner in *Costello* would have been deportable if he had never acquired citizenship, as he could have offered to plead guilty to a non-removable offense. *Costello*, 376 U.S. at 130-31.

[14] Our concurring colleague says that Singh is not removable under the aggravated felony provision – nor under

---

any other deportation provision in 8 U.S.C. § 1227(a) – because he was never "admitted" within the meaning of 8 U.S.C. § 1101(a)(13)(A) (defining admission as "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer"). We agree with many of our colleague's statements: The word "entry" focuses on "the physical act of stepping into the United States[,]" and "'admission' occurs at the port of entry after inspection[.]" (Concur. Op. at 6, 12.) Those statements establish that Singh was admitted, and we need not labor further to arrive at that conclusion.

Singh was admitted in 1991; that is, he physically entered the United States through inspection and authorization by immigration authorities, as admission is defined under the current statutory scheme. Our colleague's argument to the contrary relies on the definition of "entry" in an outdated version of the statute, rather than focusing on the definition of "admitted" in the current version. We are bound, however, to apply the law applicable at the time of Singh's removal proceedings. *See Luntungan v. Att'y Gen.*, 449 F.3d 551, 556 (3d Cir. 2006) (explaining that the older version of the INA applies to aliens whose exclusion or deportation proceedings began before April 1, 1997). (A.R. at 570-73 (providing notice to Singh in 2019 to initiate removal proceedings under the aggravated felony provision).) And even if we did turn to the old definition of "entry," Singh would still have been admitted within the meaning of 8 U.S.C. § 1101(a)(13)(A) because he was "free to ... go at large and mix with the general population." *Yang v. Maugans*, 68 F.3d 1540, 1543, 1550 (3d Cir. 1995)

By presenting himself for inspection instead of sneaking across the border without detection, he was "admitted" for

28

akin to the statutory language examined in *Costello*, and a sound interpretation of it permits removal of only those individuals who were aliens at the time they were convicted by a judge or jury. *See* 8 U.S.C. § 1227(a)(2)(A)(iii).

---

purposes of the aggravated felony provision. *See Mauricio-Vasquez v. Whitaker,* 910 F.3d 134, 136 (4th Cir. 2018) ("Under the Board's precedent, a noncitizen is 'admitted' to the United States for purposes of the INA when she enters with 'procedural regularity' by physically presenting herself at a port of entry for inspection and questioning by an immigration official. ... [P]rocedural regularity doesn't require entry on a particular visa or status." (citing *Matter of Quilantan*, 25 I. & N. Dec. 285, 293 (B.I.A. 2010))).   Singh's entry was procedurally regular regardless of his possession, or lack thereof, of any valid entry or identity documents. We have said that "[a]dmission is an occurrence, defined in wholly factual and procedural terms: An individual who presents himself at an immigration checkpoint, undergoes a procedurally regular inspection, and is given permission to enter has been admitted, regardless of whether he had any underlying legal right to do so." *Sanchez v. Sec'y U.S. Dep't of Homeland Sec.*, 967 F.3d 242, 250 (3d Cir. 2020) (quoting *Gomez v. Lynch*, 831 F.3d 652, 658 (5th Cir. 2016)), *aff'd sub nom. Sanchez v. Mayorkas*, 141 S. Ct. 1809 (2021).  While we take our colleague's point that skipping bail is not the same as having a legal right to stay in the country, Singh was given permission to enter for a limited time and purpose, i.e., for the purpose of adjudicating whether he should be excluded and hence sent back out of the country.  So we agree with the government and Singh that he was "admitted" in the sense contemplated by § 1227(a).

To summarize, Congress used a present tense "to be" verb plus "convicted" in the aggravated felony provision, indicating that the individual facing removal must have been an alien at the time of conviction. *Id.* (permitting removal for "[a]ny alien who is convicted of an aggravated felony at any time after admission"). In contrast, as the *Costello* Court explained, a past tense verb, such as that in the statute at issue in *Eichenlaub*, indicates that the individual need not have been an alien at the time of conviction to fit within the terms of the statute. *Costello*, 376 U.S. at 123. And because Congress chose the past tense form of the verb in parallel deportation provisions, we may infer that Congress intended to provide for different meanings. *See* 8 U.S.C. § 1227(a)(2)(B)(i) (permitting deportation of any alien who "*has been convicted...*") (emphasis added); *Russello*, 464 U.S. at 23. The text of the provision and inferences drawn from surrounding provisions of the INA prompt the conclusion that Singh may not be removed under the aggravated felony provision.

We reiterate that deportation is a "drastic measure[,]" requiring us to resolve doubts in favor of the party facing removal from the United States. *Padilla*, 559 U.S. at 360 (quoting *Fong Haw Tan*, 333 U.S. at 10).[15] "[S]ince the stakes

---

[15] Singh argues that an interpretation of the aggravated felony provision allowing the removal of only those individuals who were aliens at the time of conviction best comports with constitutional concerns. In *Padilla v. Kentucky*, the Supreme Court held that failure to advise a non-citizen criminal defendant that pleading guilty may result in removal constitutes ineffective assistance of counsel and violates the Sixth Amendment right to counsel. 559 U.S. 356, 364 (2010). Singh argues that *Matter of Rossi* and *Matter of Gonzalez-*

are considerable for the individual, we will not assume that Congress meant to trench on his freedom beyond that which is required by the narrowest of several possible meanings of the words used." *Costello*, 376 U.S. at 128 (quoting *Fong Haw Tan*, 333 U.S. at 10). So, beyond the text of the aggravated

---

*Muro* allow those who were citizens at the time of conviction to be subsequently removed on the basis of their subsequent denaturalization and their convictions, without receiving the protection of the right to be warned of the immigration consequences of a guilty plea. That outcome, he says, conflicts with his Sixth Amendment right to counsel as described in *Padilla*, as well as his Fifth Amendment right to due process.

We do not have to decide whether there is irreconcilable tension between *Padilla* on the one hand and *Rossi* and *Gonzalez-Muro* on the other, because *Padilla* expressly applies only to noncitizens pleading guilty, which Singh was not. *See Padilla*, 559 U.S. at 364 ("The importance of accurate legal advice for *noncitizens* accused of crimes has never been more important." (emphasis added)). It is true, however, that Singh's case raises a constitutional concern in the spirit of *Padilla*: he is facing removal, "a particularly severe penalty[,]" for his conviction from a guilty plea, a guilty plea he made without notice of the immigration consequences that could flow from the plea. *Id.* at 365 (citation and internal quotation marks omitted). The government contends that "Singh should have known that, should his fraud be uncovered, he could be found removable." (Answering Br. at 54.) But we do not generally premise procedural protections on what a criminal defendant "should" know. It is precisely because many criminal defendants do not know the consequences of pleading guilty that we require detailed notice of the resulting penalties.

felony provision and the inferences that can be drawn from surrounding provisions of the INA, longstanding jurisprudential concerns surrounding the severity of removal provide additional support for the conclusion that Singh is not removable as charged.

Finally, the government cannot succeed on the theory that Singh is removable because his denaturalization springs back in time to the date he fraudulently obtained his citizenship. The Supreme Court rejected that very argument more than half a century ago in *Costello*, 376 U.S. at 129-32, and its decision is controlling. *See Hylton*, 992 F.3d at 1161 ("Because only the Supreme Court may overturn its precedents, *Costello* controls our resolution of this issue."); *Okpala v. Whitaker*, 908 F.3d 965, 970 (5th Cir. 2018) ("*Costello* is not materially distinguishable from the facts at hand and thus controls here."). Having chosen to pursue Singh's removal solely on the basis of the aggravated felony provision,[16] the government cannot salvage its case now by trying to say that he never was a citizen to begin with and is

---

[16] As noted earlier, *supra* n.4, there was an alternative charge of removal against Singh based on his convictions for committing crimes involving controlled substances. Why the government chose not to pursue that charge is not clear in the record. Nothing in our decision today should be taken as indicating a lack of appreciation for the seriousness of such offenses or as implying that immigration consequences should not follow from them.

therefore removable regardless of how we interpret that provision.[17]

## III.   CONCLUSION

For the foregoing reasons, we will grant Singh's petition for review, vacate the BIA's order, and remand for further proceedings consistent with this opinion.

---

[17] Because we agree with Singh that he is not removable under the aggravated felony provision, we do not reach his other argument that his conviction cannot qualify as a "conviction" under 8 U.S.C. § 1101(a)(48)(A) because that section defines "conviction" in terms of formal judgment of guilt entered against an alien.

MATEY, *Circuit Judge*, concurring in the judgment.

I join the Majority's conclusion that the aggravated felony provision of the Immigration and Nationality Act ("INA") does not apply to Singh for a different reason: INA § 237(a)(2)(A)(iii), 8 U.S.C. § 1227(a)(2)(A)(iii), addresses aliens convicted "after admission," and Singh has never been "admitted." The INA defines "'admission' and 'admitted' [as], with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." INA § 101(a)(13)(A), 8 U.S.C. § 1101(a)(13)(A). Singh is present in the United States, but not through a lawful entry after inspection and authorization. As a result, the aggravated felony provision is inapplicable, and his petition must be granted.[1]

---

[1] Although Singh did not raise the issue, the parties briefed this question at the Court's request. *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law."); *Haybarger v. Lawrence Cnty. Adult Prob. & Parole*, 667 F.3d 408, 413 n.3 (3d Cir. 2012) ("[W]e retain the independent power to identify and apply the proper construction of governing law. . . . We thus may consider an issue antecedent to . . . and ultimately dispositive of the dispute before us, even an issue the parties failed to identify and brief." (cleaned up)).

# I. BACKGROUND

To understand why, it is necessary to recount the tale of two Singhs. It began in 1991, when "Davinder Singh" (Singh 1) arrived in the United States at the San Francisco International Airport. (A.R at 259–60, 496.) Lacking any travel documents, authorities placed Davinder into custody at the airport and started exclusion proceedings. After posting a bond, Davinder left confinement and vanished. An Immigration Judge later ordered Davinder excluded.

But he never left. One month later, Singh filed an asylum application under the name "Baljinder Singh" (Singh 2). (A.R. at 260, 496.) With the Baljinder application pending, Singh married a U.S. citizen and applied for an adjustment of status to lawful permanent resident ("LPR"). His adjustment application falsely claimed entry into the United States without inspection in 1991, failed to disclose that he presented himself as Davinder at the port of entry and, of course, omitted the exclusion proceedings and the order of removal. The fraud worked. In 1998, Baljinder received LPR status, and in 2006, Baljinder Singh became a naturalized citizen. Singh's multiple identities remained undiscovered even after his convictions for drug crimes. But the tale of two Singhs finally ended in 2018 when the Government figured out that Singh 1 was probably Singh 2, and a court revoked his naturalization for his fraudulent LPR application.[2]

---

[2] In the naturalization case, the District Court characterized Davinder and Baljinder as the same person. Still, as there are no facts in the record confirming Singh's true identity, I will call petitioner simply "Singh."

Relying on Singh's drug convictions, the Government started removal proceedings under the aggravated felony provision in INA § 237(a)(2)(A)(iii), 8 U.S.C § 1227(a)(2)(A)(iii). All agree that provision applies only if Singh was "admitted." The majority and the parties believe Singh meets that prerequisite. I am not persuaded.

The majority concludes that Singh 1 was admitted when released on bond pending his exclusion proceedings. (Maj. Op. Part II.C n.14.) But "entry" under the INA does not include conditional release. Singh and the Government argue Singh 2 was admitted when his status was adjusted to LPR. But an adjustment of status is not the physical act of entering the country, as we have repeatedly recognized and the Supreme Court recently confirmed. All of which means neither Singh 1 nor Singh 2 was ever admitted into the United States within the ordinary meaning of the INA.

## II. Discussion

I "begin and end our inquiry with the text" of the law. *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 137 S. Ct. 1002, 1010 (2017). Following the course repeatedly recommended by the Supreme Court, I use the "fundamental canon of statutory construction" that "words generally should be interpreted as taking their ordinary, contemporary, common meaning . . . at the time Congress enacted the statute." *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)) (alteration in original) (cleaned up). I rely on the "toolkit" containing "all the standard tools of interpretation" needed to consider the text, structure, and history of the law. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414–15 (2019); *see also* Antonin

Scalia, *Judicial Deference to Administrative Interpretations of Law,* 1989 Duke L.J. 511, 515 (1989). Doing so leads to "'a conclusion about the best interpretation,' thereby resolving any perceived ambiguity." *Shular v. United States*, 140 S. Ct. 779, 788 (2020) (Kavanaugh, J., concurring) (quoting *Kisor*, 139 S. Ct. at 2448 (Kavanaugh, J., concurring in the judgment)). Here, the best meaning of "admission" does not encompass Singh's two-step dance.

## A.    The INA's Definition of "Admission"

As noted, the INA defines "[t]he terms 'admission' and 'admitted' [to] mean, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." INA § 101(a)(13)(A), 8 U.S.C. § 1101(a)(13)(A). *See* Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. No. 104-208, § 301(a), 110 Stat. 3009–575 (1996) (defining "admission"). Each component of this definition points towards admission as requiring a physical act.

Start with "lawful entry." Before IIRIRA, the INA defined "entry" as "any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise[.]" INA § 101(a)(13) (1988); 8 U.S.C. § 1101(a)(13) (1988). Although IIRIRA replaced "entry" with "admission,"[3] "entry" remains a

---

[3] Before IIRIRA, deportability hinged on the concept of "entry" rather than "admission," an important distinction because it determined whether an alien faced exclusion or deportation. *See Rosas-Ramirez*, 22 I. & N. Dec. 616, 620 (BIA

"term of art requiring not only physical presence in the United States but also freedom from official restraint." *United States v. Argueta-Rosales*, 819 F.3d 1149, 1158 (9th Cir. 2016). "[T]his principle was established more than a century ago," *id.* (compiling cases), and its "settled meaning" remains applicable today as the INA "still makes numerous references to 'entry,' including in the new definition of 'admission' itself." *United States v. Gaspar-Miguel*, 947 F.3d 632, 634 (10th Cir. 2020); *see also Neder v. United States*, 527 U.S. 1, 21 (1999) ("Where Congress uses terms that have accumulated settled meaning under the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." (cleaned up)).

The phrase "into the United States" confirms that admission requires a physical entrance. *See* The Chicago Manual of Style ¶ 5.177 (17th ed. 2017) ("Prepositions signal

---

1999) (persons without an "entry" into the United States were charged as excludable, while those who had made an "entry" were deportable); 8 U.S.C. § 1182(a) (1988) (former grounds for exclusion); *id.* § 1251(a) (1988) (former grounds for deportation). The difference mattered, because those who followed the rules and presented themselves for inspection at the border did not enjoy the substantive and procedural rights that aliens who entered illegally by evading inspection did in deportation proceedings. *See Martinez v. Att'y Gen.*, 693 F.3d 408, 412 n.5 (3d Cir. 2012); *Landon v. Plasencia*, 459 U.S. 21, 26–27 (1982). All of which, of course, encouraged flouting, not following, the law. IIRIRA sought to remedy this imbalance by creating a uniform removal proceeding. *See Martinez*, 693 F.3d at 413 n.5.

many kinds of relationships. For example, a preposition may express a spatial relationship {to} {from} {out of} {into}"). *See also Taveras v. Att'y Gen.*, 731 F.3d 281, 290 (3d Cir. 2013) ("The words 'entry' and 'into' plainly indicate that 'admission' involves physical entrance into the country . . . ."). Taken together, the INA did not create a logical or legal fiction about entry. Its focus is on the physical act of stepping into the United States.

Nor does "inspection" alter this reading. The INA explains it is a requirement that "[a]ll aliens . . . who are applicants for admission[4] or otherwise seeking admission or readmission to . . . the United States shall be inspected by immigration officers." INA § 235(a)(3), 8 U.S.C. § 1225(a)(3). Regulations confirm that a "lawful entry" "after inspection and authorization by an immigration officer," 8 U.S.C.

---

[4] An *applicant* for admission" is "[a]n alien present in the United States who has not been admitted or who arrives in the United States[.]" INA § 235(a)(1), 8 U.S.C. § 1225(a)(1) (emphasis added). An "*application* for admission" is "the application for admission *into* the United States[.]" INA § 101(a)(4), 8 U.S.C. § 1101(a)(4) (emphasis added). In other words, reading these provisions together with INA § 235(a)(3), any alien who arrives or is present in the United States without the entrance and inspection needed for "admission" becomes an "applicant for admission" requiring inspection before being granted entry "into" the United States.

§ 1101(a)(13)(A), occurs "in person . . . at a U.S. port-of-entry." 8 C.F.R. § 235.1(a).

**B.　　Singh 1 Was Never Admitted**

Recall the tale of Singh 1. After arriving at San Francisco International Airport in 1991 without documentation, he was detained, charged as excludable under INA § 212(a)(7)(A)(i)(I), placed in exclusion proceedings, and released from confinement on bond. When he failed to appear at his January 7, 1992 hearing, he was ordered excluded and deported *in absentia*. Nothing in this sequence constituted an "admission" because at no point was Singh permitted "lawful entry" into the United States. INA § 101(a)(13)(A), 8 U.S.C. § 1101(a)(13)(A).

1.　　Singh 1's Arrival Led to Immediate and Continuous Detention

Aliens trying to enter the United States, lawfully or not, are seeking "initial entry." *Osorio-Martinez v. Att'y Gen.*, singh, 167 & n.11 (3d Cir. 2018) (quoting *Castro v. Dep't of Homeland Sec.*, 835 F.3d 422, 449 n.31 (3d Cir. 2016)). Singh, upon arrival, had not "accomplish[ed] an 'entry' by crossing the national boundary in transit or even by arrival at a port [because he was] detained there pending formal disposition of [his] request[] for admission." *United States v. Vasilatos*, 209 F.2d 195, 197 (3d Cir. 1954). That is because Singh was never free from official restraint at "[t]he pre-inspection area at the . . . port of entry," *United States v. Vazquez-Hernandez*, 849 F.3d 1219, 1227 (9th Cir. 2017), nor while he was detained. *See Matter of Lin*, 18 I. & N. Dec. 219, 222 (BIA 1982) (alien awaiting exclusion proceeding in detention had not "entered"

the United States under the INA, even after escape); *Argueta-Rosales*, 819 F.3d at 1155. At this point, Singh had not entered the country.

### 2.    Singh 1's Release on Bond

What about Singh's release on bond? The majority says this was an admission because Singh was given "permission to enter for a limited time and purpose, i.e., for the purpose of adjudicating" his exclusion. (Maj. Op. at Part II.C n.14.) But that reading contradicts the INA's "well-established" meaning of "entry." *Yang v. Maugans*, 68 F.3d 1540, 1545 (3d Cir. 1995).

Bond has long been understood as a "transfer [of] custody of the defendant from the officers of the law to the surety on the bail bond, whose undertaking is to redeliver the defendant to legal custody at the time and place appointed in the bond." *Bail Bond*, Black's Law Dictionary (11th ed. 2019) (definition of "bail bond" dating to 17th century). In the immigration context, an "immigration delivery bond functions as a 'bail bond[.]'" *United States v. Minn. Tr. Co.*, 59 F.3d 87, 89 & n.2 (8th Cir. 1995) (citing *Bail Bond*, Black's Law Dictionary 140 (6th ed. 1990)). That means a "person brought into the United States by the authorities, and then released on bond, never entered the United States. His case is like that of one who had been stopped at the border and kept there all the time." *United States ex rel. Ling Yee Suey v. Spar*, 149 F.2d 881, 883 (2d Cir. 1945); *see also Kaplan v. Tod*, 267 U.S. 228, 230 (1925) (alien awaiting disposition of application for admission whose "prison bounds were enlarged by committing her to the custody" of caretakers for nine years "was still in theory of law at the boundary line and had gained no foothold

in the United States"). Release on bond does not render the alien free from official restraint, and so fails to satisfy that "well-established" prerequisite to accomplishing a lawful entry. *Yang*, 68 F.3d at 1545.

Congress codified this concept in the INA. The INA gives the Attorney General discretion to "parole" into the United States aliens who are "applying for admission," but "such parole of such alien shall not be regarded as an admission of the alien[.]" 8 U.S.C. § 1182(d)(5)(A); *see id.* § 1182(d)(5)(A) (1988) (same language); INA, Pub. L. No. 82-414, § 212, 66 Stat. 163, 188 (1952) (same language) (codified at 8 U.S.C. § 1182(d)(5) (1952)). Once "the purposes of such parole" have been served, the alien "shall forthwith return or be returned to the custody from which he was paroled" and "be dealt with in the same manner as that of any other applicant for admission to the United States." 8 U.S.C. § 1182(d)(5)(A); *id.* § 1182(d)(5)(A) (1988) (same); *id.* § 1182(d)(5) (1952) (same); *see also Chi Thon Ngo v. INS*, 192 F.3d 390, 392 n.1 (3d Cir. 1999).

Bond and parole serve the same purpose under the INA.[5] An alien's temporary release on parole is, like a release on bond, "simply a device through which needless confinement

---

[5] For example, resident aliens arrested can be released either on bond or conditional parole pending their removal hearing. *Jennings v. Rodriguez*, 138 S. Ct. 830, 847 (2018) (citing 8 U.S.C. § 1226(a)). The Attorney General may revoke either basis for temporary release and return the alien to custody. 8 U.S.C. § 1226(b); *see also* 8 U.S.C. § 1252(a)(1) (Supp. 1989) (predecessor provision to § 1226(a)); INA, Pub. L. No. 82-414, § 242(a), 66 Stat. 163, 208–09 (1952).

is avoided while [exclusion] proceedings are conducted" that never "place[s] her legally within the United States." *Leng May Ma v. Barber*, 357 U.S. 185, 190 (1958) (cleaned up); *see also United States ex rel. Tom We Shung v. Murff*, 176 F. Supp. 253, 256 (S.D.N.Y. 1959) (holding that alien paroled and released on bond pending exclusion proceedings was "still, in theory of law, 'on the threshold of initial entry.'" (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953))), *aff'd sub nom.*, *United States ex rel. We Shung v. Esperdy*, 274 F.2d 667 (2d Cir. 1960) (per curiam).

And "[a]n alien paroled into the United States has not 'entered' the United States for immigration purposes." *Correa v. Thornburgh*, 901 F.2d 1166, 1169 n.3 (2d Cir. 1990) (citing 8 U.S.C. § 1182(d)(5)(A) and collecting cases); *see also Vitale v. INS*, 463 F.2d 579, 582 (7th Cir. 1972) (holding that, for the period between inspection at the airport to alien's exclusion hearing, "[t]he placing of Vitale in the custody of Alitalia Airlines constituted parole; [so] he did not effect an entry into the United States"). In other words, "those seeking 'admission' and trying to avoid 'exclusion'" may have been "within our territory (or at its border), *but the law treated them as though they had never entered the United States at all*." *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 175 (1993) (emphasis added). Put it all together and Singh's conditional, temporary release on bond did not accomplish an entry.

Nor did Singh enter the country by skipping out on his bond. *See Siu Fung Luk v. Rosenberg*, 409 F.2d 555, 558–59 (9th Cir. 1969) (alien in exclusion proceedings whose parole was revoked but did not have to appear for two years had still not made an entry); *Mariscal-Sandoval v. Ashcroft*, 370 F.3d 851, 855–56 (9th Cir. 2004) (expiration of parole for two-

month period did not establish an entry); *Matter of Lin*, 18 I. & N. Dec. 219, 222 (BIA 1982) (escaping border detention is not an entry). Nothing else in Singh 1's saga could be treated as entry and admission.

### 3. Singh 1's 1992 Exclusion

Any lingering doubt is erased by the 1992 order of exclusion. Remember that before Congress amended the INA in 1996, exclusion proceedings determined whether aliens like Singh would "be allowed to enter" the United States. 8 U.S.C. § 1226(a) (1988); *id.* § 1226(a) (1994). Aliens who had entered the country, by contrast, followed a separate "expulsion" procedure "commonly referred to as deportation proceedings." *Leng May Ma*, 357 U.S. at 187; 8 U.S.C. §§ 1251(a), 1252(b) (1988); *Landon v. Plasencia*, 459 U.S. 21, 28 (1982) (explaining that "only 'entering' aliens are subject to exclusion" (citation omitted)); *see also Yang*, 68 F.3d at 1547. Singh 1's exclusion means he was not "allowed to enter" the United States, 8 U.S.C. § 1226(a) (1988), and that means he never gained "*lawful entry . . .* into the United States after inspection and authorization by an immigration officer." INA § 101(a)(13)(A), 8 U.S.C. § 1101(a)(3)(A) (emphasis added).

## C. Singh 2 Was Never Admitted

Singh and the Government argue that Singh 2's status adjustment to LPR in 1998 was his admission. But that defies

the text and structure of the INA as consistently interpreted by this Court and recently affirmed by the Supreme Court.

1.   Singh 2's Adjustment of Status Was Not an Admission

"Lawful status and admission . . . are distinct concepts in immigration law: Establishing one does not necessarily establish the other." *Sanchez v. Mayorkas*, 141 S. Ct. 1809, 1813 (2021) (citing *Sanchez v. Sec'y Dep't of Homeland Sec.*, 967 F.3d 242, 246 (3d Cir. 2020)). An "admission" under INA § 101(a)(13)(A) refers to an "event or action," while being "lawfully admitted for permanent residence" under INA § 101(a)(20) refers to "an immigration status." *Hanif v. Att'y Gen.*, 694 F.3d 479, 485 (3d Cir. 2012); *see also Gomez v. Lynch*, 831 F.3d 652, 658 (5th Cir. 2016) (distinguishing "admission," which is "an occurrence" where an individual "presents himself at an immigration checkpoint" and gains entry, with status, which "describes [an individual's] type of permission to be present in the United States"). While an "admission" occurs at the port of entry after inspection, adjustment of status is "a procedure that is structured to take place entirely within the United States." *Taveras*, 731 F.3d at 290; *see also* INA § 245(a), 8 U.S.C. § 1255(a) (provision governing adjustment of status to lawful permanent resident); 8 C.F.R. § 245 (procedure for adjusting status). It "allow[s] an alien who is already physically located in the United States . . . to obtain lawful permanent resident status while remaining within the United States without having to go abroad and obtain an immigrant visa at a United States consulate." *Taveras*, 731 F.3d at 289 (citing *Malik v. Att'y Gen.*, 659 F.3d 253, 257 (3d Cir. 2011) (describing status adjustment by consular processing)). "Admission" is a prerequisite to

obtaining adjustment of status under 8 U.S.C. § 1255(a). *See Sanchez*, 141 S. Ct. at 1815 ("Section 1255 generally requires a lawful admission before a person can obtain LPR status.").[6]

Given the INA's clear distinction between status adjustment and admission, "it does not follow that a grant of lawful status *is* an admission." *Sanchez*, 967 F.3d at 246. The Supreme Court unanimously agrees: a grant of lawful status "does not come with a ticket of admission" nor does it "constructively 'admit'" someone. *Sanchez*, 141 S. Ct. at 1813. So we have repeatedly rejected the argument that admission and adjustment are the same. *Hanif*, 694 F.3d at 484–85 (rejecting Government's argument); *Sanchez*, 967 F.3d at 245 (rejecting petitioner's).[7]

---

[6] A few narrow exceptions exist. *See* 8 U.S.C. § 1255(g) (treating certain special immigrants who were never "admitted" into the United States as "paroled" for purposes of status adjustment under § 1255(a)); *id.* § 1255(i) (permitting adjustment of status for aliens who entered the United States without inspection in some cases). Congress occasionally provides others. *See* Immigration Reform and Control Act of 1986, Pub. L. 99-603, 100 Stat. 3359, 3394 (codified at 8 U.S.C. § 1255a) (temporarily permitting adjustment to LPR status for aliens who unlawfully entered the United States before January 1, 1982).

[7] As have the Fourth, Fifth, and Eleventh Circuits. *See Bracamontes v. Holder*, 675 F.3d 380, 385–86 (4th Cir. 2012) ("admission" and "admitted" "both contemplate a physical crossing of the border following the sanction and approval of United States authorities" but "simply does not include an adjustment of status"); *Martinez v. Mukasey*, 519 F.3d 532, 544

Undeterred and oddly united,[8] the Government and Singh persist in asserting that adjustment of status qualifies as an "admission," pointing to our decision in *Martinez v. Attorney General*, 693 F.3d 408 (3d Cir. 2012). It is a new twist

---

(5th Cir. 2008) ("'admission' is the lawful *entry* of an alien after inspection, something quite different, obviously, from post-entry adjustment of status"); *Marques v. Lynch*, 834 F.3d 549, 561 (5th Cir. 2016) (filing for adjustment of status to LPR is not an application for admission); *Lanier v. Att'y Gen.*, 631 F.3d 1363, 1366 (11th Cir. 2011) (the definition of "admitted" in INA § 101(a)(13)(A) is "limited[] and does not encompass a post-entry adjustment of status"); *Ortiz-Bouchet v. Att'y Gen.*, 714 F.3d 1353, 1356 (11th Cir. 2013) (per curiam) (admission under INA § 212(a)(7)(A)(i)(I) does not include a post-entry adjustment of status).

[8] The Government's argument that Singh's adjustment of status is an "admission" is curious because it conflicts with its own policy. *See* 7 U.S. Citizenship and Immigr. Serv., Policy Manual, § 2.A.2 (Aug. 12, 2021), https://www.uscis.gov/policy-manual/volume-7-part-b-chapter-2 ("A noncitizen is admitted if the following conditions are met: The noncitizen applied for admission as an 'alien' at a port of entry; and [a]n immigration officer inspected the applicant for admission as an 'alien' and authorized him or her to enter the United States in accordance with the procedures for admission." (citations omitted)). It also contradicts its position before us in *Sanchez*, 967 F.3d at 245 ("According to the Government, 'lawful status' does not qualify as an 'admission' because the concepts are distinct.").

on the familiar arguments that we rejected in *Hanif* and *Sanchez*,[9] and equally unavailing.

In *Martinez*, the petitioner first entered the United States without inspection and authorization but then left to adjust his status at the United States consulate in Nicaragua. 693 F.3d at 409–410; *see also Malik*, 659 F.3d at 257 (recognizing that aliens may obtain LPR status "through consular processing"

---

[9] And it is an interpretation the BIA has adopted despite acknowledging that it defies "the plain language of section 101(a)(13)(A)" and "has not generally been well received by the courts of appeals, including the [] Third Circuit." *Matter of Chavez-Alvarez*, 26 I. & N. Dec. 274, 276–77 (BIA 2014). But since "[w]e owe no deference to the agency's interpretation of these statutes," *Sanchez*, 967 F.3d at 246 n.4, there is no reason to defer to interpretations that are admittedly unmoored from the text of the INA and contrary to Circuit precedent. *See Lanier*, 631 F.3d at 1367 n.3 (finding no ambiguity in the use of "admission" in INA § 212(h) and according no deference to the BIA's interpretation that admission includes a post-entry adjustment of status). Despite the potentially unwelcome results, *Rosas-Ramirez*, 22 I. & N. Dec. at 621, or seemingly "absurd consequences" of the unambiguous text, *Chavez-Alvarez*, 26 I. & N. Dec. at 276, "we cannot substitute our judgment for that of Congress" to avoid the sometimes "awkward" situations the law enables. *Hanif*, 694 F.3d at 487; *see also New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) ("[I]f judges could freely invest old statutory terms with new meanings, we would risk amending legislation outside the 'single, finely wrought and exhaustively considered, procedure' the Constitution commands." (quoting *INS v. Chadha*, 462 U.S. 919, 951 (1983))).

under 8 U.S.C. § 1201(a)). Upon his return to the United States, he was "admitted following" the "inspection and authorization by an immigration officer at the port of entry." *Martinez*, 693 F.3d at 410, 413 n.6, 416 (citing 8 U.S.C. § 1101(a)(13)(A)). Nothing in *Martinez* suggests that the petitioner's adjustment of status at the consulate constituted his admission. I decline to read *Martinez* to say what it does not. And that leaves us where we started: "bound to follow Congress's definition in § 1101(a)(13)(A), which defines admission as the physical event of entering the country." *Sanchez*, 967 F.3d at 250 (citing *Taveras*, 731 F.3d at 290). So Singh 2's adjustment to LPR was not an "admission."

2.     Singh 2's Fraudulent Adjustment Is Not an Admission

Even assuming a different reading of the INA, the District Court's finding that Singh obtained his adjustment through fraud is the end of the road. "[A]n alien whose status has been adjusted to LPR—but who is subsequently determined to have obtained that status adjustment through fraud—has not been 'lawfully admitted for permanent residence' because the 'alien is deemed, *ab initio,* never to have obtained [LPR] status.'" *Gallimore v. Att'y Gen.*, 619 F.3d 216, 223 (3d Cir. 2010) (quoting *Koloamatangi*, 23 I. & N. Dec. 548, 551 (BIA 2003)). Even accepting the (false) premise that adjustment is admission, Singh's fraud eliminated a lawful adjustment and cannot constitute admission.

**III. CONCLUSION**

Perhaps Singh's tale is unusual. I can speculate that few aliens seeking the privilege of life in the United States follow

Singh's triple-play of criminality attempting an unlawful entry, succeeding in a fraudulent adjustment, followed by a conspiracy to distribute and possess with intent to distribute heroin, MDMA, and marijuana. But Singh's immigration status is not uncommon and many aliens present in this country have never been "admitted." Like Singh, they are all "applicants for admission," INA § 235(a)(1), 8 U.S.C. § 1225(a)(1), and if they qualify as "inadmissible under [INA §] 212[, 8 U.S.C. § 1182]," they are removable. *See* INA § 240(e)(2), 8 U.S.C. § 1229a(e)(2); *see also* 8 C.F.R. § 235.1(f)(2) ("An alien present in the United States who has not been admitted or paroled . . . is subject to the provisions of [INA §] 212[, 8 U.S.C. § 1182] . . . and to removal"). There are many grounds for inadmissibility and removal under INA § 212, 8 U.S.C. § 1182, and the Executive Branch regularly relies on those grounds for removal actions.

But for aliens who *have* been admitted, another section of the INA governs their removability. "[I]n the case of an alien admitted to the United States, . . . the alien is deportable under [INA §] 237[, 8 U.S.C. § 1227]." INA § 240(e)(2)(B), 8 U.S.C. § 1229a(e)(2)(B). Section 237 does not apply to those who have *not* been admitted. INA § 237(a), 8 U.S.C. § 1227(a) ("Any alien . . . in and admitted to the United States shall . . . be removed if the alien is within one or more of the following classes of deportable aliens . . . ."). An elegant system or "King Minos's labyrinth in ancient Crete"? *Marques v. Lynch*, 834 F.3d 549, 558 (5th Cir. 2016) (quoting *Lok v. INS*, 548 F.2d 37, 38 (2d Cir. 1977)). That is not ours to answer. Nor, following the lead of the Government, can we simply skip past Singh's brazen, but successful, sidesteps around the port of entry to focus on his thick file of misconduct. One can question the wisdom of creating a removability provision exclusive to those

who have been "admitted," and the enforcement system that adjusts the status of an alien who, it seems rather obvious, barely tried to hide his past. But that only highlights the "perils of substituting stories for statutes," *McGirt v. Oklahoma*, 140 S. Ct. 2452, 2470 (2020), an expedience that might seem attractive in the moment, but risks "upsetting reliance interests in the settled meaning of a statute." *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019). Congress created a predicable framework for the Executive to "faithfully execute[]." U.S. Const. art. II, § 3. When the Executive veers from that framework, it is this Court's duty to correct course.

The Government wants to remove Singh under the aggravated felony provision, which resides in INA § 237. For that provision to apply, Singh must be admitted. But he never was, so the Government's chosen path is unavailable. For these reasons, I concur only in the judgment granting Singh's petition.